UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

PRICEPLAY.COM, INC.

                Plaintiff,

    v.

GOOGLE INC.

                Defendant.

C.A. No. 14-386-RGA

JURY TRIAL DEMANDED

**DEFENDANT GOOGLE INC.'S ANSWER TO PLAINTIFF PRICEPLAY.COM'S
AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Google Inc. ("Google") by and through the undersigned counsel, answers the
Amended Complaint for Patent Infringement ("Amended Complaint") (Dkt. 10) of plaintiff
Priceplay.com, Inc. ("Plaintiff" or "PricePlay") as follows:

**THE PARTIES**

1.      Google is without knowledge or information sufficient to form a belief as to the
truth or falsity of the allegations in paragraph 1 of the Amended Complaint and therefore denies
them.

2.      Google admits it is a Delaware corporation with its corporate headquarters and
principal place of business at 1600 Amphitheatre Parkway, Mountain View, California, 94043,
and that its registered agent in Delaware is The Corporation Trust Company located at
Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The remainder of
the allegations in this paragraph constitute a legal conclusion and do not require further response
(e.g., admission or denial) from Google. Google denies any remaining allegations in this
paragraph.

## JURISDICTION AND VENUE

3.      Google admits that this action invokes the United States patent laws, and that this Court has subject matter jurisdiction over patent law claims.  Google denies the remaining allegations of this paragraph, including any allegation of infringement of the patent identified in the Amended Complaint.

4.      Google admits that this Court has personal jurisdiction for the purposes of this particular action, but contends that requiring the parties to litigate here is not convenient or in the interests of justice under 28 U.S.C. 1404(a).  Google admits that it is incorporated under the laws of the State of Delaware.  Google denies Plaintiff's allegation that it has committed any acts of patent infringement, directly or indirectly, whether in this District of elsewhere.   Google denies the remaining allegations of this paragraph.

5.      Google admits that venue is proper in the District of Delaware for purposes of this particular action, but contends that requiring the parties to litigate here is not convenient or in the interests of justice under 28 U.S.C. 1404(a).  Google denies Plaintiff's allegation that it has committed any acts of patent infringement, directly or indirectly, whether in this District of elsewhere.  Google denies the remaining allegations of this paragraph.

## THE ASSERTED PATENTS

6.      Google admits that what appears to be a copy of United States Patent No. 8,050,982 (the "'982 Patent") was attached to Plaintiff's original Complaint (Dkt. No. 1) as Exhibit A.  Google further admits that the face of what appears to be the '982 Patent indicates that: its title is "Systems And Methods For Transacting Business Over A Global Communications Network Such As The Internet;" the named inventor is Wayne W. Lin; and that the date of patent is November 1, 2011.  Google denies that a true and correct copy of the '982 Patent is attached to the Amended Complaint.  Google is without knowledge or information

sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 6 of the Amended Complaint and therefore denies them.

7.    Google admits that what appears to be a copy of United States Patent No. 8,494,917 (the "'917 Patent") was attached to Plaintiff's original Complaint (Dkt. No. 1) as Exhibit B. Google further admits that the face of what appears to be the '917 Patent indicates that: its title is "Systems And Methods For Transacting Business Over A Global Communications Network Such As The Internet;" the named inventor is Wayne Weiyuan Lin; and that the date of patent is July 23, 2013. Google denies that a true and correct copy of the '917 Patent is attached to the Amended Complaint. Google is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 7 of the Amended Complaint and therefore denies them.

8.    Paragraph 8 does not contain any factual averments that require a response from Google.

## FACTUAL BACKGROUND

9.    To the extent Plaintiff's allegations are intended to reflect the state of the art, claim scope, or an appropriate construction of any of the claim terms (*e.g.*, "binding buy-sell contract"), Google denies them. Google is currently without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 9, and therefore denies them.

10.    To the extent Plaintiff's allegations are intended to reflect the state of the art, claim scope, or an appropriate construction of any of the claim terms, Google denies them. Google denies that "e-commerce business models . . . all had the common goal of attracting as many customers as possible, ultimately to lead to more transactions, and hence more profit for the companies employing the models." Google also denies that all e-commerce business models

"focus in one way or another on factors typically considered important to buyers – namely price and convenience."  Google is currently without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 10, and therefore denies them.

11.     To the extent Plaintiff's allegations are intended to convey a contention that Mr. Lin "invented" or "discovered" any novel idea or concept, Google denies these allegations. Google is currently without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 11, and therefore denies them.

12.     To the extent Plaintiff's allegations are intended to convey a contention that Mr. Lin "invented" or "discovered" any novel idea or concept, Google denies these allegations. Google is currently without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 12, and therefore denies them.

13.     To the extent Plaintiff's allegations are intended to convey a contention that Mr. Lin "invented" or "discovered" any novel idea or concept, Google denies these allegations. Google is currently without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 13, and therefore denies them.

14.     To the extent Plaintiff's allegations are intended to convey a contention that Mr. Lin "invented" or "discovered" any novel idea or concept, Google denies these allegations. Google further denies any allegation that Google may have adopted any embodiment disclosed in U.S. Patent No. 6,978,253 ("the '253 Patent").  Google is currently without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 14, and therefore denies them.

15.     Google is currently without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 15, and therefore denies them.

16.     To the extent Plaintiff's allegations are intended to characterize the patent, the claim language, or the subject matter of the claims, Google denies these allegations.  Google is currently without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 16, and therefore denies them.

17.     Google denies the allegations of Paragraph 17.

### COUNT 1 – INFRINGEMENT OF THE '982 PATENT

18.     Paragraph 18 does not contain any factual averments that require a response from Google.  Google incorporates by reference its response to Paragraphs 1-17.

19.     Google denies the allegations contained in Paragraph 19.

20.     Google denies the allegations contained in Paragraph 20.

21.     Google denies the allegations contained in Paragraph 21.

22.     Google denies the allegations contained in Paragraph 22.  In particular, Google denies that the Complaint was sufficient to constitute notice of the '982 patent or of any allegation of infringement against it.

23.     Google denies the allegations contained in Paragraph 23.

### COUNT II – INFRINGEMENT OF THE '917 PATENT

24.     Paragraph 24 does not contain any factual averments that require a response from Google.  Google incorporates by reference its response to Paragraphs 1-23.

25.     Google denies the allegations contained in Paragraph 25.

26.     Google denies the allegations contained in Paragraph 26.

27.     Google denies the allegations contained in Paragraph 27.

28.     Google denies the allegations contained in Paragraph 28.  In particular, Google denies that the Complaint was sufficient to constitute notice of the '917 patent or of any allegation of infringement against it.

29.     Google denies the allegations contained in Paragraph 29.

## PRAYER FOR RELIEF

30.     Google denies that Plaintiff is entitled to any relief whatsoever, including all relief requested in Plaintiff's "Prayer for Relief."  To the extent any statement in the Prayer for Relief is deemed factual, it is denied.

## DEFENSES

31.     Subject to the responses above, Google alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein.  In addition to the affirmative defenses described below, and subject to its responses above, Google specifically reserves all rights to allege additional defenses that become known through the course of discovery.

## FIRST DEFENSE – NON-INFRINGEMENT

32.     Google does not infringe and has not infringed (directly, contributorily, or by inducement), either literally or under the doctrine of equivalents, and is not liable for infringement of any valid and enforceable claim of the '982 or '917 Patents (collectively the "Patents-in-Suit").

## SECOND DEFENSE - INVALIDITY

33.     The claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 101 because the claims are directed to abstract ideas or other non-statutory subject matter.

34. The claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 102 because the claims lack novelty, and are taught and suggested by the prior art.

35. The claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 103 because the claims are obvious in view of the prior art.

36. The claims of the Patents-in-Suit are invalid and unenforceable for failure to satisfy the conditions set forth in 35 U.S.C. § 112, including failure of written description, lack of enablement, and claim indefiniteness.

## THIRD DEFENSE – LIMITATIONS ON PATENT DAMAGES

37. Plaintiff's claim for damages, if any, against Google for alleged infringement of the Patents-in-Suit are limited by 35 U.S.C. §§ 286, 287, and/or 288.

## FOURTH DEFENSE – PROSECUTION HISTORY ESTOPPEL

38. By reason of statements, representations, concessions, admissions, arguments, and/or amendments, whether explicit or implicit, made by or on behalf of the applicant during the prosecution of the patent applications that led to the issuance of the Patents-in-Suit, Plaintiff's claims of patent infringement are barred in whole or in part by the doctrine of prosecution history estoppel.

## FIFTH DEFENSE - ESTOPPEL

39. Plaintiff's claims are barred, in whole or in part, by the doctrines of estoppel, laches, prosecution laches, disclaimer, patent misuse, and/or waiver.

## SIXTH DEFENSE – UNCLEAN HANDS

40. Plaintiff's claims against Google are barred under the doctrine of unclean hands.

## SEVENTH DEFENSE – INEQUITABLE CONDUCT

41. The '982 Patent issued on November 1, 2011. It resulted from U.S. Patent Application No. 11/262,527 ("'527 Application"), filed on October 28, 2005. The '982 Patent

claims priority to then-pending U.S. Patent Application No. 09/342,866, which became the '253 Patent.

42. The '917 Patent issued on July 23, 2013. It resulted from U.S. Patent Application No. 13/200,230 ("'230 Application"), filed on September 20, 2011. The '917 Patent claims priority to both the '982 Patent and '253 Patent.

43. A Request for an *Ex Parte* Reexamination of the '253 Patent was filed on April 1, 2009. The PTO instituted a Reexamination of the '253 Patent, and the Reexamination was assigned Reexamination Control Number 90/009,444. The PTO subsequently issued an Ex Parte Reexamination Certificate on April 11, 2014, cancelling all claims under reexamination as unpatentable.

44. The '982 Patent, '917 Patent, and '253 Patent all have the same named inventor – Wayne W. Lin.

45. The same law firm, Westerman, Hattori, Daniels & Adrian, LLP and its prosecuting attorney(s) (collectively "Westerman Hattori"), prosecuted the '982 Patent, prosecuted the '917 Patent, and represented Mr. Lin in the Reexamination of the '253 Patent. Westerman Hattori is also counsel of record for PricePlay in this litigation.

46. The '982 Patent and '917 Patent (collectively "Child Patents") are unenforceable due to the commission of inequitable conduct and violation of the provisions of 37 C.F.R. § 1.56 in procuring the Child Patents by the named inventor, Westerman Hattori, and/or other persons owing a duty of candor to the PTO.

     A.    **Inequitable Conduct During the Prosecution of the '982 Patent**

         1.    **Failure to Disclose Prior Art Presented During Litigation Involving the '253 Patent and Other Litigation Material in an Information Disclosure Statement During Prosecution of the '982 Patent**

47. Mr. Lin, Westerman Hattori, and/or other persons owing a duty of candor failed to disclose in an Information Disclosure Statement with the intent to deceive to the PTO material prior art and other information in their possession, which they knew or should have known the PTO would consider material to the PTO's decision to grant the '982 Patent.

48. Issued claims 1-12 of the '982 Patent are substantially similar to and at most obvious variations of the originally-issued claims of the '253 Patent. For instance, under the broadest reasonable interpretation standard used by the PTO, issued independent claim 7 of the '982 Patent is at most an insubstantial, obvious variation of originally-issued dependent claim 13 of the '253 Patent:

| Claim 7 of the '982 Patent | Claim 13 of the '253 Patent |
| --- | --- |
| 7. A process of performing a sales transaction comprising the steps of: | 1. A method of doing business over a global communications network comprising the steps: |
| communicating via a global communication network to a buyer; | communicating to a buyer via the global communications network, a description of a product; |
| receiving data representing a binding commitment from the buyer via the global communication network to purchase a product for a price that will be partially based upon the buyer's participation in an auction and participation in a competitive activity that is in addition to placing bids in the auction and that is collateral to the price and associated with the product being purchased; | accepting a first request from the buyer to buy the product for a price to be determined within a price range; accepting a second request from the buyer to allow the price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA); |
| receiving data over the global communications network, said data representing the participation in the PDA; and wherein the competitive activity is required as part of the sales transaction; and | receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA; and |
| using an algorithm to calculate, via an operation controller computer, the price of | determining the price of the product based at least partially upon the data received, |

| | |
|---|---|
| the product based at least partially upon the results of the participation of the buyer in the competitive activity and at least partially based on results of the auction; wherein the price is at least partially dependent on the outcome of the competitive activity. | said price being within the price range and scaled to the performance of the buyer.<br><br>13. The method of claim 1, wherein the price is determined at least partially upon participation of the buyer in an auction. |

49. Any difference between issued independent claim 7 of the '982 Patent and originally-issued dependent claim 13 of the '253 Patent is at best an insubstantial, obvious variation.

50. The '253 Patent was previously asserted against Google and a number of entities ("previous defendants") by Performance Pricing, Inc. ("previous plaintiff"). PricePlay, the previous plaintiff, the named inventor of the '253 Patent and '982 Patent, and others involved in the prosecution of the '982 Patent were aware of this previous litigation involving the '253 Patent and any documents, prior art, or other information learned by the previous plaintiff. In fact, PricePlay substituted in as the appellant (for Performance Pricing) for the purposes of appeal in the prior litigation and is therefore itself a party to the case.

51. On October 30, 2008, the previous defendants provided the previous plaintiff with Defendants' First Amended Invalidity Contentions. Defendants' First Amended Invalidity Contentions presented a number of prior art references and included claim charts demonstrating the materiality of these prior art references to the validity of the claims of the '253 Patent.

52. On April 22, 2009, the applicant filed two Information Disclosure Statements in the application that would become the '982 Patent citing some of the prior art references presented in Defendants' First Amended Invalidity Contentions, but omitting several others. Specifically, the applicant chose not to disclose Defendants' First Amended Invalidity

Contentions or any of the following prior art references presented therein in the Information Disclosure Statements filed on April 22, 2009:

| |
|---|
| "The CDNow Story" |
| "H&R Block" |
| "Individual" |
| "Making Money" |
| "Alottafun!" |
| "Hecht" |
| "Sterne" |
| "YGI and YGIR" |
| "Yoyodyne" |
| "eBay S-1A Filing" |
| "McClellan" |
| "Classic" |
| "Pickett" |
| "Shoe Carnival" |
| "Simpsons" |

53.     Documents relating to and reflecting these references were also produced in the prior litigation, and Defendants' expert on invalidity provided a written opinion (Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity) discussing several of them as well. Neither the references themselves, nor the pleadings and documents that reflect them, were disclosed during the prosecution of the '982 Patent.

54.     Under the broadest reasonable interpretation standard used by the PTO, several if not all of the prior art references listed above render the issued claims of the '982 Patent invalid under 35 U.S.C. §§ 102(a), 102(b), 102(e), and/or 103(a).  By way of example but not limitation, "Shoe Carnival" discloses, explicitly or implicitly, all elements of claim 7 of the '982 Patent, thereby rendering the '982 Patent invalid pursuant to either 35 U.S.C. § 102 or § 103:

| Claim 7 of the '982 Patent | "Shoe Carnival"[1] |
|---|---|
| 7. A process of performing a sales transaction comprising the steps of: | Shoe Carnival was a consumer retailer and therefore involved in performing sales transactions:<br><br> |
| communicating via a global communication | Like most consumer retailers, Shoe Carnival displayed its products within its stores, thereby communicating them to a buyer: |

---

[1]   The images reflected herein are taken directly from documents produced during the parties' prior litigation and which were used during multiple depositions, including expert depositions.

| | |
|---|---|
| network to a buyer; |  |
| | Shoe Carnival also engaged in advertising via a communication network. In any event, even if Shoe Carnival does not expressly disclose a global communication network, it would have been obvious to one of skill in the art to adapt a previously mechanical or known business process to the Internet. |
| receiving data representing a binding commitment from the buyer via the global communication | Like most consumer retailers, Shoe Carnival received a request from a buyer to purchase a product: |

network to purchase a product for a price that will be partially based upon the buyer's participation in an auction and participation in a competitive activity that is in addition to placing bids in the auction and that is collateral to the price and associated with the product being purchased;



Either the requests to purchase represent binding commitments or, at a minimum, it would have been obvious from the buyer's request to purchase a product that such requests may be commensurate with a binding commitment.  For example, as indicated by the Examiner in an Office Action mailed on August 2, 2010 during the Reexamination of the '253 Patent, "[i]t would have been obvious to one of ordinary skill in the art to modify [the cited art according to the teachings of U.S. Patent No. 5,620,182 ("Rossides '182")] to commit the buyer by requiring payment prior to the initiation of the games so as to 'prevent cheating.'"

In Shoe Carnival, the price of the product was partially based upon the buyer's participation in a competitive activity (*e.g.,* spinning a wheel) that was collateral to the price and associated with the product being

purchased:



At a minimum, it would have been obvious for the price of the product at Shoe Carnival to also be partially based upon the buyer's participation in an auction. For example, the background section of the '982 Patent admits that it was known in the prior art for a consumer retailer, such as Shoe Carnival, to "use an auction model."

| wherein the competitive activity is required as part of the sales transaction; and | At a minimum, it would have been obvious for Shoe Carnival's competitive activity (*e.g.,* spinning of the wheel) to be required as part of the sales transaction. For example, Shoe Carnival required that a buyer spin the wheel (*i.e.,* the competitive activity) in order to receive a discount: |
| --- | --- |



The excitement inherent in the Shoe Carnival shopping experience is designed to create spur-of-the-moment and multiple unit sales.

Spin the Spin-N-Win™ wheel and receive an additional discount on the already low price.

| using an algorithm to calculate, via an operation controller computer, the price of the product based at least partially upon the results of the participation of the buyer in the competitive | Shoe Carnival used an algorithm to calculate the price of the product based at least partially upon the result of the participation of the buyer in the competitive activity, wherein the price was at least partially dependent on the outcome of the competitive activity. For example, the price one of Shoe Carnival's customer's had to pay for a product was decreased based on a discount the customer got when he or she spun a wheel as part of the competitive activity: |
|---|---|

activity and at least partially based on results of the auction; wherein the price is at least partially dependent on the outcome of the competitive activity.



55.     Over five hundred (500) pages of documents were produced in the prior litigation on September 5, 2008, showing how Shoe Carnival operated and disclosing the claim limitations of the '253 and '982 Patents.  The prior plaintiff, the named inventor of the '253 Patent and '982 Patent, Westerman Hattori, and others involved in the prosecution of the '982 Patent were well aware of these documents and their materiality, but failed to disclose them to the Examiner responsible for examining the '982 Patent.

56. Under the broadest reasonable interpretation standard used by the PTO, several other references listed above in paragraph 52 (all of which were the subject of Defendants' Amended Invalidity Contentions and were reflected in documents produced during the prior litigation) disclose key elements of the issued claims of the '982 Patent and alone or in combination render obvious at least issued claim 7 of the '982 Patent. For example: "The CDNow Story" discloses referral-based discounts, where buyers seeking to gain discounts based on referrals are competing with other buyers who are seeking to refer the same potential customers to a business; "Individual" discloses an auction whereby advertisers submit price bids for advertising space; "Yoyodyne" discloses a game involving competition with another buyer so as to make advertisement consumption more interesting; and "McClellan" discloses an auction whereby advertisers submit price bids for advertising space or time. Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '982 Patent failed to disclose any of this material prior art during the prosecution of the '982 Patent.

57. The named inventor of the '253 Patent and '982 Patent, Wayne W. Lin, his prosecuting attorneys (Westerman Hattori), and others involved in the prosecution of the '982 Patent also failed to appraise the Examiner of the fact that the parent '253 Patent was asserted against the previous defendants or of *any filings* the previous plaintiff received during this lawsuit. For example, among other material evidence, the patentee failed to disclose the Report of Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity filed on September 22, 2009. In his Report, Dr. Shamos opined that the '253 Patent was invalid in view of the prior art references presented in Defendants' First Amended Invalidity Contentions and provided a detailed explanation of both the art and the state of the art. As another example, the Court issued a Markman Order on July 15, 2009, and a Summary Judgment Order on March 10, 2010. Both

of these Orders were subsequently appealed to the Federal Circuit and affirmed *per curiam* in *PricePlay, Inc. v. Google, Inc.*, 410 Fed. Appx. 325 (Fed. Cir. Feb. 11, 2011).  However, the named inventor of the '253 Patent and '982 Patent, Wayne W. Lin, and others involved in the prosecution of the '982 Patent never disclosed the Markman Order, the Summary Judgment Order, the Federal Circuit's affirmation of both Orders, or any of the briefing submitted in relation to these Orders to the PTO.  In sum, the named inventor and those involved in the prosecution of the '982 Patent kept the Examiner responsible for examining the '982 Patent in the dark regarding the prior assertion of the '253 Patent.

58.     The filings and evidence from the prior litigation are material to the prosecution of the '982 Patent and were required to be disclosed.  MPEP § 2001.06(b)-(c).  By way of example, but not limitation, the Markman Order, Summary Judgment Order, and briefs discuss that a "competitive activity," as described in the '982 Patent and '253 Patent, can be used to determine the price of a product, but that such an activity "is not otherwise part of a sales transaction."  However, in direct conflict with this conclusion, the applicant amended the claims to recite that "the competitive activity is required as part of the sales transaction" in the '982 Patent.  Had the Examiner of the '982 Patent application been aware of the Orders, he would have understood (for example) the fundamental, internal contradiction in the '982 Patent's requirement of "a competitive activity" and the later-added limitation that "the competitive activity is required as part of the sales transaction," which renders the patent invalid pursuant to at least 35 U.S.C. § 112.  Similarly, the Orders discuss the requirement present in the '982 Patent claims and the original '253 Patent that "price is at least partially dependent on the outcome of the competitive activity."  Had the Examiner of the '982 Patent application been aware of the Orders, he would have understood the fundamental, internal contradiction in the '982 Patent's

requirement that the competitive activity be collateral to the price yet the price also be dependent on that competitive activity, which renders the patent invalid pursuant to at least 35 U.S.C. § 112.

59.     Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '982 Patent not only knew of the prior litigation materials but also was aware of their materiality.  For example, the patentee considered Defendants' First Amended Invalidity Contentions, the Report of Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity, the Markman Order, and the Summary Judgment Order sufficiently material to the validity of the claims of the '253 Patent to cite them during the Reexamination of the '253 Patent in an Information Disclosure Statement filed on January 10, 2010.   The Examiner responsible for the Reexamination of the '253 Patent and for considering the material cited in the January 10, 2010 Information Disclosure Statement, Sam Rimell, was not the same examiner as the Examiner responsible for the examination of the '982 Patent, Michael Misiaszek.  And the patentee failed to cite this material in the examination of the '982 Patent.

60.     Under the broadest reasonable interpretation standard used by the PTO, the claims of the '253 Patent under reexamination when the January 10, 2010 Information Disclosure Statement was filed were not substantially different from and at most obvious variations of the issued claims of the '982 Patent.  For instance, under the broadest reasonable interpretation standard used by the PTO, issued independent claim 7 of the '982 Patent was substantively identical to claim 13 of the '253 Patent under reexamination on January 10, 2010 :

| Issued Claim 7 of the '982 Patent | Amended Claim 13 of the '253 Patent |
|---|---|
| 7.  A <u>process of performing a sales transaction</u> comprising the steps of: | 1.  A method of doing business over a global communications network comprising the steps: |

| | |
|---|---|
| communicating via a global communication network to a buyer; | communicating to a buyer via the global communications network, a description of a product; |
| receiving data representing a binding commitment from the buyer via the global communication network to purchase a product for a price that will be partially based upon the buyer's participation in an auction and participation in a competitive activity that is in addition to placing bids in the auction and that is collateral to the price and associated with the product being purchased; wherein the competitive activity is required as part of the sales transaction; and | accepting a first request from the buyer to buy the product for a price to be determined within a price range, the first request indicating that the buyer is bound to purchase the product prior to the price being determined; accepting a second request from the buyer to allow the price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA); |
| | receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA; and |
| using an algorithm to calculate, via an operation controller computer, the price of the product based at least partially upon the results of the participation of the buyer in the competitive activity and at least partially based on results of the auction; wherein the price is at least partially dependent on the outcome of the competitive activity. | determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer.

13. The method of claim 1, wherein the price is determined at least partially upon participation of the buyer in an auction. |

61.    Documents from the prior litigation, including Defendants' First Amended Invalidity Contentions, the Report of Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity, the Markman Order, and the Summary Judgment Order, are therefore material to the validity of the claims of the '982 Patent, as the patentee acknowledged these documents to be material to the validity of the claims of the '253 Patent subject to reexamination.  On information and belief, Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '982 Patent were aware of the materiality of this evidence, yet failed to

cite it during prosecution of the patent. MPEP § 2001.06(b)-(c) (requiring disclosure of information from prior prosecution and prior litigation).

62. The decision to withhold documents from the prior litigation, including Defendants' First Amended Invalidity Contentions, the prior art references listed therein (including those identified in paragraph 52), the Report of Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity, the Markman Order, the Summary Judgment Order, and the Federal Circuit Decision affirming both Orders, during the prosecution of the '982 Patent was made knowingly and with intent to deceive the PTO. Indeed, the failure to disclose either the fact of the prior litigation or *any pleadings or filings* from the prior litigation without any reasonable explanation is strongly indicative of an intent to deceive the PTO. Failure to disclose this magnitude of highly material information has no reasonable explanation and is strongly indicative of an intent to deceive the PTO.

63. On information and belief, Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '982 Patent knowingly withheld additional material evidence of invalidity and/or unenforceability during prosecution of the '982 Patent with an intent to deceive the PTO.

64. None of the most salient documents from the prior litigation, including Defendants' First Amended Invalidity Contentions, the prior art references listed above in paragraph 52, the Report of Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity, the Markman Order, the Summary Judgment Order, and the Federal Circuit Decision affirming both Orders, were independently discovered by the Examiner of the '982 Patent, and none appear in the "References Cited" section of the '982 Patent.

65. But for the failure of Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '982 Patent to disclose material evidence from the prior litigation, including

Defendants' First Amended Invalidity Contentions, the prior art references listed above in paragraph 52, the Report of Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity, the Markman Order, the Summary Judgment Order, and the Federal Circuit Decision affirming both Orders, at least claims 1-12 of the '982 Patent would not have issued. The failure to disclose this and other material evidence germane to the prosecution of the patent caused the PTO to improperly issue the '982 Patent claims.

2.      **Failure to Disclose the Reexamination of the '253 Patent in an Information Disclosure Statement During Prosecution of the '982 Patent**

66.      Mr. Lin, Westerman Hattori, and/or other persons owing a duty of candor also failed to disclose material evidence of the reexamination of the '253 Patent (to which the '982 Patent relates). On information and belief, this failure to disclose material evidence of the parallel prosecution activity, including the reexamination examiner's adverse decisions about substantially similar claims, was done with the intent to deceive the PTO and affect the outcome of the prosecution. The reexamination material, including the Examiner's office actions and other orders, are non-cumulative of each other or of any of the art cited by the patentee during the examination of the '982 Patent and would have been considered material to the PTO's decision to grant the '982 Patent.

67.      The Request for *Ex Parte* Reexamination of the '253 Patent was filed on April 1, 2009, requesting the reexamination of originally-issued claims 1, 2, 9-15, 18, and 30 of the '253 Patent. The Request demonstrated that the originally-issued claims of the '253 Patent, which, as discussed above in paragraph 48, were substantially similar to and at most obvious variations of the issued claims of the '982 Patent, were invalid under 35 U.S.C. §§ 102(a), 102(b), 102(e), and/or 103(a).

23

68. On June 19, 2009, the Examiner instituted the Reexamination of the '253 Patent. In the Order granting the Reexamination of the '253 Patent, the Examiner indicated that the Request filed on April 1, 2009, raised a number of substantial new questions of patentability affecting claims of the '253 Patent for which reexamination was requested.

69. In a Non-Final Office Action dated March 3, 2010, the Examiner rejected claims 1, 2, 9-10, 12-15, 18 and 30 under 35 U.S.C. § 102(b) as being anticipated by "E-Commerce That May Be Closer to Home: Key Is Safe Settlement of the Bill" ("Asahi") and claim 11 under 35 U.S.C. § 103(a) as being unpatentable over Asahi in view of U.S. Patent No. 5,779,549 ("Walker").

70. On April 23, 2010, applicant and the Examiner held a telephonic interview. According to an Interview Summary mailed by the Examiner on April 23, 2010, the amendments proposed by the applicant, which added the requirement that "the buyer is bound to purchase the product," were at most obvious in view of the prior art and did not render the claims patentable.

71. In an Amendment and Response under 37 C.F.R. §§ 1.111 and 1.550 dated April 28, 2010, the applicant amended independent claims 1, 18, and 30 of the '253 patent.

72. The as-amended claims are not substantially different from the issued claims of the '982 Patent. For instance, under the broadest reasonable interpretation standard used by the PTO, issued independent claim 7 of the '982 Patent is substantively identical to amended claim 13 of the '253 Patent:

| Issued Claim 7 of the '982 Patent | Amended Claim 13 of the '253 Patent |
|---|---|
| 7. A process for performing a sales transaction comprising the steps of: | 1. A method of doing business over a global communications network comprising the steps: |
| communicating via a global communication network to a buyer; | communicating to a buyer via the global communications network, a description of |

| | a product; |
|---|---|
| receiving data representing <u>a binding commitment from the buyer</u> via the global communication network <u>to purchase a product for a price that will be partially based upon the buyer's participation in an auction and participation in a competitive activity</u> that is in addition to placing bids in the auction and that is collateral to the price and associated with the product being purchased; wherein the competitive activity is required as part of the sales transaction; and | accepting a first request <u>from the buyer to buy the product</u> for a price to be determined within a price range, the first request indicating <u>that the buyer is bound to purchase the product prior to the price being determined;</u> accepting a second request from the buyer to allow <u>the price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA);</u> |
| | receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA; and |
| using an algorithm to <u>calculate</u>, via an operation controller computer, <u>the price of the product based at least partially upon the results of the participation of the buyer in the competitive activity and at least partially based on results of the auction;</u> wherein <u>the price is at least partially dependent on the outcome of the competitive activity</u>. | <u>determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer.</u><br><br>13. The method of claim 1, wherein <u>the price is determined at least partially upon participation of the buyer in an auction</u>. |

73.     After receiving the applicants April 28, 2010 amendment, the Examiner maintained in whole or in part his rejection of claims 1, 2, 9-15, 18, 20-23 and 30 of the '253 Patent.  On August 2, 2010, the Examiner issued a second Non-Final Office Action  rejecting claims 1, 2, 9-10, 12-15, 18, 20-23 and 30 under 35 U.S.C. § 103(a) as unpatentable over Asahi in view of U.S. Patent No. 5,620,182 ("Rossides '182") and claim 11 under 35 U.S.C. § 103(a) as unpatentable over Asahi in view of Rossides '182 and Walker.

74.     The applicant then filed a Response to Second Non-Final Office Action and an accompanying Declaration under 37 C.F.R. 1.132 on September 30, 2010.  The Examiner was not convinced by the applicant's arguments and issued a Final Office Action on November 9,

2010, maintaining his previous rejection of all claims under reexamination and responding to applicant's arguments from the September 30, 2010 Response.

75.     Thereafter, the applicant filed a Response under 37 C.F.R. 1.116 to Final Office Action in an Ex-Parte Reexamination on January 10, 2011.  However, the Examiner (again) disagreed with the applicant's argument and issued an Advisory Action on February 17, 2011, maintaining his previous rejection of all claims under reexamination.

76.     The applicant subsequently appealed the Examiner's rejections to the Board of Patent Appeals and Interferences' in an Appeal Brief filed on April 11, 2011.  In response to the Appeal Brief, the Examiner issued an Examiner's Answer on May 12, 2011, in which he further elaborated on his reasoning for rejecting the claims of the 253 Patent under reexamination and responded to applicant's arguments from the April 11, 2011 Appeal Brief.

77.     The Board of Patent Appeals and Interferences, in a decision issued on August 24, 2012, affirmed all of the Examiner's rejections.

78.     The applicant subsequently appealed the Board of Patent Appeals and Interferences' decision to the U.S. Court of Appeals for the Federal Circuit in a Brief filed on February 4, 2013.  The United States Court of Appeals for the Federal Circuit, in a *per curium* opinion issued on October 10, 2013, also affirmed the Examiner's rejection of all claims of the '253 Patent under reexamination.

79.     Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '982 Patent failed to disclose the existence of the reexamination or any of the orders or other material from the reexamination during the prosecution of the '982 Patent, including but not limited to: the Order mailed on June 19, 2009, the Non-Final Office Action mailed on March 3, 2010, the Interview Summary mailed on April 23, 2010, the second Non-Final Office Action mailed on

August 2, 2010, the Final Office Action on November 9, 2010, the Advisory Action mailed on February 17, 2011, and the Examiner's Answer mailed on May 12, 2011.

80.     The aforementioned prosecution history constitutes "another examiner's adverse decision about substantially similar claims" and, as such, is material to the claims of the '982 Patent.  These materials are non-cumulative of each other or of any of the art cited by the patentee during the examination of the '982 Patent.  By way of example but not limitation, the manner in which Claim 13 of the '253 patent was amended during the reexamination rendered it not patentably distinct from one or more issued claims of the '982 Patent (*e.g.*, claim 7). Accordingly, at least claim 7 of the '982 Patent should have been rejected due to obviousness-type double patenting in view of amended claim 13 of the '253 Patent.  The existence of the Reexamination of the '253 Patent was therefore material to the examination of the '982 Patent. In another example, the Examiner responsible for the Reexamination found that "[i]t would have been obvious to one of ordinary skill in the art to modify [the cited art according to the teachings of U.S. Patent No. 5,620,182 ("Rossides '182")] to commit the buyer by requiring payment prior to the initiation of the games so as to 'prevent cheating.'"  This finding would have been material to the prosecution of the '982 Patent, in which similar limitations requiring a "binding commitment" from the buyer to overcome prior art challenges were raised by the applicant in a Response to Non-Final Office Action filed by the applicant on August 25, 2010.

81.     In yet another example of the materiality of the reexamination, the Examiner's conclusions regarding Asahi alone or in combination with Rossides '182 are applicable to at least issued claim 7 of the '982 Patent.  In particular, the Examiner found (as the BPAI affirmed) that under the broadest reasonable interpretation standard, these references rendered obvious claims that are not substantially different from the issued claims of the '982 Patent.

| Issued Claim 7 of the '982 Patent | *E-Commerce That May Be Closer to Home: Key Is Safe Settlement of the Bill*, Asahi Shimbun, Tokyo Morning Edition, June 22, 1996, at 19 ("Asahi") |
|---|---|
| 7. A process of performing a sales transaction comprising the steps of: | Asahi discloses a process for performing a sales transaction.<br><br>For example, as explained by the Examiner responsible for the Reexamination of the '253 Patent, Asahi discloses a method of doing business, such as home shopping. Office Action (08/02/10) at 3 ("**A method of doing business** (page 3, 'home shopping')"). |
| communicating via a global communication network to a buyer; | Asahi discloses communicating via a global communication network to a buyer.<br><br>For example, as explained by the Examiner responsible for the Reexamination of the '253 Patent, Asahi discloses communicating a description of a product to a buyer via the global communication network. Office Action (08/02/10) at 3 ("**communicating to a buyer via the global communications network, a description of a product** ([Asahi,] page 1, seventh paragraph, '. . . shows the menu of products being handled to appear on the screen . . . . Illustrations of meat, vegetables, fish, eggs, milk and so on were arrayed on the screen'. Also, [Asahi,] page 3 second paragraph, '875 shops hawking their wares', and [Asahi,] page 3, third paragraph, 'looking at a screen showing the used car marketplaces of every region'");"). |
| receiving data representing a binding commitment from the buyer via the global communication network to purchase a product for a price that will be partially based upon the buyer's participation in an auction and participation in a competitive activity that is in addition to placing bids in the auction and that is collateral to the price and associated with the product being purchased; | Asahi discloses receiving data representing a binding commitment from the buyer via the global communication network to purchase a product for a price that will be partially based upon the buyer's participation in an auction and participation in a competitive activity that is in addition to placing bids in the auction and that is collateral to the price and associated with the product being purchased.<br><br>For example, as explained by the Examiner responsible for the Reexamination of the '253 Patent, Asahi discloses receiving data, such as a first and second request, representing the buyer's desire to purchase a product for a price that will be partially based upon the buyer's participation in a competitive activity, such as playing |

rock-paper-scissor. Office Action (08/02/10) at 4 (**"accepting a first request form the buyer to buy the product for a price to be determined within a price range** ([Asahi,] page 4, first paragraph, 'I chose CD cassette recorder for the trial', also [Asahi,] page 4, third paragraph, 'I decided to place an order here');"); Office Action (08/02/10) at 4 (**"accepting a second request from the buyer to allow the price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA)** ([Asahi,] page 3, seventh through eighth paragraph, 'I also tried 'electronic payment', which you do with the communications network of a computer up to payment. The following teaser phrase first appeared on the screen: 'If you win at 'paper-rock-scissors', the price goes down bit by bit')").

At a minimum, as explained by the Examiner responsible for the Reexamination of the '253 Patent, Asahi, alone or in view of Rossides '182, renders obvious that the received data represents a binding commitment to purchase the product. Examiner Interview Summary (04/23/10) at 2 ("(1) Examiners pointed out that feature proposed for amendment to claims 1, 18 and 30 was admitted as prior art in the Background Section of the patent under reexamination (US Patent 6,978,253). Examiners indicated that amending the claims to add this particular feature would lead to an obviousness type rejection using the admitted prior art as a secondary reference. (2)Examiners pointed out that the particular timing of when during the process a user becomes bound or contractually obligated to make a purchase is not particularly specified in Asahi, although no specific language was agreed to for addressing this feature."); Office Action (08/02/10) at 4 (**"the first request indicating that the buyer is bound to purchase the product prior to the price being determined** (Rossides '182 at col. 5, line 20 through col. 6, line 55; the examples illustrating payment made prior to the bet, indicating that the buyer is committed to purchase prior to the bet. The payment made influences the odds of winning. It would have been obvious to one of ordinary skill in the art to modify Asahi to commit the buyer by requiring payment prior to the initiation of the game so as to 'prevent cheating' (Rossides '182 at col. 1, line 27); to assure payment to the seller for items being sold as taught

by <u>Rossides '182</u>; and to influence the odds of winning (<u>Rossides '182</u> at col. 5, line 20 through col. 6, line 55);"); Final Office Action (11/09/10) at 12 ("In particular, Rossides '182 at col. 5, line 20 through col. 6, line 55 provide examples where payment is made prior to the bet, indicating the buyer is committed to purchase prior to the bet."); Final Office Action (11/09/10) at 13 ("The examples of <u>Rossides '182</u> at col. 5, line 20 through col. 6, line 55 clearly indicate in every instance that the payment is made prior the bet, thus committing the purchaser financially prior to the game of change. This is further demonstrated by the fact that the odds of winning are established by the amount of money paid upfront in advance of bet. In example of col. 5, line 29-42, the store owner pays $100 upfront to purchase a stock of 500 pens, thus setting the odds of winning at 1/5. If, as patent owner suggests, the payment were made after the bet, there would be no odds of winning within the invention of <u>Rossides '182</u>, and hence no bet. Accordingly, patent owner's assumption contradicts the disclosure of <u>Rossides '182</u>."); Examiner's Answer (05/12/11) at 18 ("The 'encoding' referred to by <u>Asahi</u> above is simply a step of calling the buyer by telephone for the purpose of buyer identification. <u>While this does resolve the problem of identifying the buyer, it does not address problems related to the buyer's behavior</u>, such as a buyer that repeatedly plays the game and does not front payment until a win is achieved. <u>Rossides</u> solves the problem by requiring an up-front pre-payment to financially commit the buyer prior to the execution of the game.").

Moreover, as explained by the Examiner responsible for the Reexamination of the '253 Patent, Asahi discloses that the price that will also be partially based upon the buyer's participation in an auction, such as a reverse auction. Office Action (08/02/10) at 6 ("**The method of claim 1, wherein the price is determined at least partially upon participation of the buyer in an auction** ([<u>Asahi</u>,] page 4, second and paragraphs. The offering of a product at a variable price constitutes an auction of that product. Offering a product at a declining price ('22,000 yen -> 13,800 yen') correlates to a reverse auction)."); Final Office Action (11/09/10) at 17-18 ("Claim 13 merely recites the presence of some generic auction and multiple participants. It is completely silent as to the type

of auction being performed. Accordingly, if Asahi teaches a reverse auction, it fully teaches the claimed 'auction' of claim 11."); Advisory Action (02/17/11) at 8 ("It is also noted that neither the original patent specification, nor the claims of record actually define the nature of the auction, so the price determining activity of Asahi or Rossides '182 cannot be ruled out as a type of auction."); Examiner's Answer (05/12/11) at 20-21 ("In a reexamination proceeding involving claims of a non-expired patent, claims are given the broadest reasonable interpretation consistent with the specification and limitations in the specification are not read into the claims (*In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984, and MPEP 2258, Section G)). Pursuant to such interpretation, examiner finds the offering of a product at a variable price constitutes an auction of that product. Offering a product at a declining price ('22,000 yen -> 13,800 yen') correlates to a reverse auction. Additionally, the reexamination patent specification at col. 4, line 39 explicitly allows for the reverse auction sales model. The evidence described in patent owner's specification explicitly supports the application of a reverse auction, and examiner finds no evidence to exclude reverse auctions from the scope of claim 13. Patent owner's assertions at pages 19-20 of the brief asserting that reverse auctions are excluded actually runs in direct contradiction to the content of the reexamination patent specification.").

Finally, as explained by the Examiner responsible for the Reexamination of the '253 Patent, Asahi discloses that the competitive activity, such as the playing of rock-paper-scissor, is in addition to playing bids in the auction. Final Office Action (11/09/10) at 18-19 ("Since Asahi illustrates exactly what is described in the above quotation from patent owner; a 13,800 yen bid accepted by a buyer[,] Asahi fully teaches the features of claim 21.").

| | |
|---|---|
| wherein the competitive activity is required as part of the sales transaction; and | At a minimum, it would have been obvious for Asahi's competitive activity (*e.g.*, playing rock-paper-scissor) to be required as part of the sales transaction. For example, Asahi required that a buyer play rock-paper-scissor (*i.e.*, the competitive activity) in order to for the price to go down. |

| | |
|---|---|
| using an algorithm to calculate, via an operation controller computer, the price of the product based at least partially upon the results of the participation of the buyer in the competitive activity and at least partially based on results of the auction; wherein the price is at least partially dependent on the outcome of the competitive activity. | Asahi discloses using an algorithm to calculate, via an operation controller computer, the price of the product based at least partially upon the results of the participation of the buyer in the competitive activity and at least partially based on results of the auction; wherein the price is at least partially dependent on the outcome of the competitive activity.

For example, as explained by the Examiner responsible for the Reexamination of the '253 Patent, Asahi discloses using an algorithm to calculate the price of a product, such as by determining the price of the product, based at least partially upon the results of the participation of the buyer in the competitive activity and the outcome of the competitive activity, such as how many games of rock-paper-scissor the buyer wins.  Office Action (08/02/10) at 4-5 ("**receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA** ([Asahi,] page 4, second paragraph, 'Since the woman in the illustration challenged me by saying 'choose your hand', I tried my luck by choosing 'rock'' Choosing 'rock' is an input from the buyer that is transmitted over the network representing the buyer's action or performance);"); Office Action (08/02/10) at 5 ("**determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer** ([Asahi,] page 4, second paragraph, 'The standard price is 22,000 yen. If you win once, 16,800 yen. The second time it is 13,800 yen'. Also [Asahi,] page 3, eight paragraph, 'If you win at 'paper-rock-scissors', the price goes down bit by bit').").

Moreover, , as explained by the Examiner responsible for the Reexamination of the '253 Patent, Asahi discloses that the price of the product is based at least partially on the buyer's participation in, and thus result of, the auction, such as a reverse auction.  Office Action (08/02/10) at 6 ("**The method of claim 1, wherein the price is determined at least partially upon participation of the buyer in an auction** ([Asahi,] page 4, second and paragraphs. The offering of a product at a variable price constitutes an auction of that product. Offering a product at a declining price ('22,000 yen -> 13,800 yen') correlates to a reverse auction).");  Final |

Office Action (11/09/10) at 17-18 ("Claim 13 merely recites the presence of some generic auction and multiple participants. It is completely silent as to the type of auction being performed. Accordingly, if <u>Asahi</u> teaches a reverse auction, it fully teaches the claimed 'auction' of claim 11."); Advisory Action (02/17/11) at 8 ("It is also noted that neither the original patent specification, nor the claims of record actually define the nature of the auction, so the price determining activity of <u>Asahi</u> or <u>Rossides '182</u> cannot be ruled out as a type of auction."); Examiner's Answer (05/12/11) at 20-21 ("In a reexamination proceeding involving claims of a non-expired patent, claims are given the broadest reasonable interpretation consistent with the specification and limitations in the specification are not read into the claims (*In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984, and MPEP 2258, Section G)). Pursuant to such interpretation, examiner finds the offering of a product at a variable price constitutes an auction of that product. Offering a product at a declining price ('22,000 yen -> 13,800 yen') correlates to a reverse auction. Additionally, the reexamination patent specification at col. 4, line 39 explicitly allows for the reverse auction sales model. The evidence described in patent owner's specification explicitly supports the application of a reverse auction, and examiner finds no evidence to exclude reverse auctions from the scope of claim 13. Patent owner's assertions at pages 19-20 of the brief asserting that reverse auctions are excluded actually runs in direct contradiction to the content of the reexamination patent specification.").

82.     The Board of Patent Appeals and Interferences (BPAI) affirmed the Examiner's rejection of the claims of the '253 Patent as well as the Examiner's analysis of Asahi (and Asahi in combination with Rossides). For example, the BPAI agreed with the Examiner's conclusion that Asahi expressly discloses a reverse auction and would at least render obvious the auction format disclosed in the patent. Decision on Appeal (Aug. 24, 2012) at 11. The BPAI further agreed with the Examiner's finding that Rossides requires that "a user must make a prepayment which is not refundable and binds the user to purchase" and that "Asahi discloses that a request

is accepted prior to the final price of an item being shown." *Id*. at 7-8. Thus, these references teach the "binding commitment" element that the applicant added to claim 13 of the '253 Patent as well as the '982 Patent.[2]

83. On information and belief, Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '982 Patent were aware of the materiality of this evidence, yet failed to cite it during prosecution of the patent. MPEP § 2001.06(b)-(c) (requiring disclosure of information from prior prosecution and prior litigation).

84. The failure to disclose *any evidence* of the reexamination of the ancestor '253 Patent during the parallel prosecution of the '982 Patent is highly indicative of the patentee's deceptive intent. On information and belief, the decision to withhold the Reexamination of the '253 Patent, the Request for Reexamination filed on April 1, 2009, the Order mailed on June 19, 2009, the Non-Final Office Action mailed on March 3, 2010, the Interview Summary mailed on April 23, 2010, the second Non-Final Office Action mailed on August 2, 2010, the Final Office Action on November 9, 2010, the Advisory Action mailed on February 17, 2011, and the Examiner's Answer mailed on May 12, 2011 from the prosecution of the '982 Patent was made knowingly and with intent to deceive the PTO.

85. The Examiner who was responsible for the Reexamination of the '253 Patent, Sam Rimell, and whose comments and discussions are reflected in the improperly withheld reexamination orders was not the same examiner as the Examiner responsible for the examination of the '982 Patent, Michael Misiaszek. As such, the Examiner responsible for

---

[2]  The BPAI decision was issued after the '982 Patent. However, the BPAI's acceptance of the Examiner's findings in the '253 reexamination demonstrate that they were persuasive and would likely have influenced the Examiner's findings in the '982 Patent prosecution as well.

examining the '982 Patent did not know or have any reason to know that the originally-issued claims of the '253 Patent were subject to further amendments.

86.     None of the Reexamination of the '253 Patent, the Request for Reexamination filed on April 1, 2009, the Order mailed on June 19, 2009, the Non-Final Office Action mailed on March 3, 2010, the Interview Summary mailed on April 23, 2010, the second Non-Final Office Action mailed on August 2, 2010, the Final Office Action on November 9, 2010, the Advisory Action mailed on February 17, 2011, or the Examiner's Answer mailed on May 12, 2011 were independently discovered by the Examiner of the '982 Patent, and none appear in the "References Cited" section of the '982 Patent.

87.     But for the failure of those responsible for the prosecution of the '982 Patent to disclose the Reexamination of the '253 Patent, the Request for Reexamination filed on April 1, 2009, the Order mailed on June 19, 2009, the Non-Final Office Action mailed on March 3, 2010, the Interview Summary mailed on April 23, 2010, the second Non-Final Office Action mailed on August 2, 2010, the Final Office Action on November 9, 2010, the Advisory Action mailed on February 17, 2011, and the Examiner's Answer mailed on May 12, 2011 at least claims 1-12 of the '982 Patent would not have issued.

88.     As a result of all the actions described above, all claims of the '982 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '982 and related patents.

B.     **Inequitable Conduct During the Prosecution of the '917 Patent**

1.     **Failure to Disclose Prior Art Presented During Litigation Involving the '253 Patent and Other Litigation Material in an Information Disclosure Statement During Prosecution of the '917 Patent**

89.     Mr. Lin, Westerman Hattori, and/or other persons owing a duty of candor failed to disclose in an Information Disclosure Statement with the intent to deceive to the PTO material

prior art and other information in their possession, which they knew or should have known the PTO would consider material to the PTO's decision to grant the '917 Patent.

90.   Issued claims 1-18 of the '917 Patent are substantially similar to and at most obvious variations of the originally-issued claims of the '253 Patent.  For instance, under the broadest reasonable interpretation standard used by the PTO, issued independent claim 13 of the '917 Patent is substantively identical to and at most an obvious variation of originally-issued dependent claim 13 of the '253 Patent:

| Claim 13 of the '917 Patent | Claim 13 of the '253 Patent |
|---|---|
| 13. A method of calculating a sale price in an auction <u>over a global communications network</u>, said method comprising | 1. A method of doing business <u>over a global communications network</u> comprising the steps: |
| <u>receiving data from a buyer representing participation in an intermediary activity;</u> | <u>receiving data from the buyer</u> over the global communications network, said data <u>representing the performance of the buyer during the PDA</u>; and |
| receiving data from the buyer representing <u>at least one bid for a product;</u> | [13. The method of claim 1, wherein the price is determined at least partially upon <u>participation of the buyer in an auction</u>.] |
| assigning <u>a score at least partially based on the buyer's participation in the intermediary activity;</u> | [receiving data from the buyer over the global communications network, said <u>data representing the performance of the buyer during the PDA</u>; and] |
| <u>calculating the sale price</u> using a price determining algorithm via at least one computer server, <u>wherein the sale price is at least partially dependent on the score and the at least one bid</u>. | <u>determining the price of the product based</u> at least partially upon the data received, <u>said price</u> being within the price range and <u>scaled to the performance of the buyer</u>.<br><br>13. The method of claim 1, wherein <u>the price is determined at least partially upon participation of the buyer in an auction</u>. |

91.     Any difference between issued independent claim 13 of the '917 Patent and originally-issued dependent claim 13 of the '253 Patent is at best an insubstantial, obvious variation.

92.     The '253 Patent was previously asserted against Google and a number of entities ("previous defendants") by Performance Pricing, Inc. ("previous plaintiff").  PricePlay, the previous plaintiff, the named inventor of the '253 Patent and '917 Patent and others involved in the prosecution of the '917 Patent were aware of this previous litigation involving the '253 Patent and any documents, prior art, or other information learned by the previous plaintiff.  In fact, PricePlay substituted in as the appellant (for Performance Pricing) for the purposes of appeal in the prior litigation and is therefore itself a party to the case.

93.     On October 30, 2008, the previous defendants provided the previous plaintiff with Defendants' First Amended Invalidity Contentions.  Defendants' First Amended Invalidity Contentions presented a number of prior art references and included claim charts demonstrating the materiality of these prior art references to the validity of the claims of the '253 Patent.

94.     On December 7, 2012, the applicant filed an Information Disclosure Statements in the application that would become the '917 Patent citing some of the prior art references presented in Defendants' First Amended Invalidity Contentions, but omitting several others. Specifically, the applicant chose not to disclose Defendants' First Amended Invalidity Contentions or any of the following prior art references presented therein in the Information Disclosure Statements filed on December 7, 2012:

| "The CDNow Story" |
|---|
| "H&R Block" |
| "Individual" |
| "Making Money" |
| "Alottafun!" |
| "Hecht" |

| |
|---|
| "Sterne" |
| "YGI and YGIR" |
| "Yoyodyne" |
| "eBay S-1A Filing" |
| "McClellan" |
| "Classic" |
| "Pickett" |
| "Shoe Carnival" |
| "Simpsons" |

95. Documents relating to and reflecting these references were also produced in the prior litigation, and Defendants' expert on invalidity provided a written opinion (Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity) discussing several of them as well. Neither the references themselves, nor the pleadings and documents that reflect them, were disclosed during the prosecution of the '917 Patent.

96. Under the broadest reasonable interpretation standard used by the PTO, several if not all of the prior art references listed above render the issued claims of the '917 Patent invalid under 35 U.S.C. §§ 102(a), 102(b), 102(e), and/or 103(a). By way of example but not limitation, "Shoe Carnival" discloses, explicitly or implicitly, all elements of claim 13 of the '917 Patent, thereby rendering the '917 Patent invalid pursuant to either 35 U.S.C. § 102 or § 103:

| Claim 13 of the '917 Patent | "Shoe Carnival" |
|---|---|
| 13. A method of calculating a sale price in an auction over a global communications network, said method comprising: | Shoe Carnival was a consumer retailer that calculated sale prices for its products: |



At a minimum, it would have been obvious for Shoe Carnival's products to be sold in an auction. For example, the background section of the '917 Patent admits that it was known in the prior art for a consumer retailer, such as Shoe Carnival, to "use an auction model."

Shoe carnival also engaged in advertising via a global communication network.  In any event, even if Shoe Carnival does not expressly disclose a global communication network, it would have been obvious to one of skill in the art to adapt a previously mechanical or known business process to the Internet.

| receiving data from a buyer | Shoe Carnival received information from its buyer regarding his or her participation in an intermediary activity (*e.g.,* spinning of a |

| | |
|---|---|
| representing participation in an intermediary activity; | wheel).  For example, Shoe Carnival would receive information identifying the discount the buyer was entitled to from the spinning the wheel:<br><br> |
| receiving data from the buyer representing at least one bid for a product; | At a minimum, it would have been obvious for Shoe Carnival to receive at least one bid from the buyer for one of its products.  For example, the background section of the '917 Patent admits that it was known in the prior art for a consumer retailer, such as Shoe Carnival, to "use an auction model." In such an auction model, the consumer retailer (*e.g.,* Shoe Carnival) would receive at least one bid from the buyer. |
| assigning a score at least | Shoe Carnival assigned a score (*e.g.,* a discount) that was based on the buyer's spinning of the wheel: |

| | |
|---|---|
| partially based on the buyer's participation in the intermediary activity; |  |
| calculating the sale price using a price determining algorithm via at least one computer server, wherein the sale price is at least partially dependent on the score and the at least one | Shoe Carnival calculated a scaled sales price for its products using a price determining algorithm that depended on the discount a buyer was entitled to based on the spinning of the wheel: |

bid.



At a minimum, it would have been obvious for the scaled sales price of the product at Shoe Carnival to also be partially based upon at least one bid received from the buyer. For example, the background section of the '917 Patent admits that it was known in the prior art for a consumer retailer, such as Shoe Carnival, to "use an auction model."

Shoe Carnival also used a computer to calculate the scaled sales price. In any event, even if Shoe Carnival does not expressly disclose a computer server, it would have been obvious to one of skill in the art to adapt a previously mechanical or known business process to the Internet.

97.     Over five hundred (500) pages of documents were produced in the prior litigation on September 5, 2008, showing how Shoe Carnival operated and disclosing the claim limitations of the '253 and '917 Patents.  The prior plaintiff, the named inventor of the '253 Patent and '917 Patents, Westerman Hattori, and others involved in the prosecution of the '917 Patent were well aware of these documents and their materiality, but failed to disclose them to the Examiner responsible for examining the '917 Patent.

98.     Under the broadest reasonable interpretation standard used by the PTO, several other references listed above in paragraph 93 (all of which were the subject of Defendants' Amended Invalidity Contentions and were reflected in documents produced during the prior litigation ) disclose key elements of the issued claims of the '917 Patent and alone or in combination render obvious at least issued claim 13 of the '917 Patent.  For example: "The CDNow Story" discloses referral-based discounts, where buyers seeking to gain discounts based on referrals are competing with other buyers who are seeking to refer the same potential customers to a business; "Individual" discloses an auction whereby advertisers submit price bids for advertising space; "Yoyodyne" discloses a game involving competition with another buyer so as to make advertisement consumption more interesting; and "McClellan" discloses an auction whereby advertisers submit price bids for advertising space or time.  Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '917 Patent failed to disclose any of this material prior art during the prosecution of the '917 Patent.

99.     Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '917 Patent also failed to appraise the Examiner responsible for examining the '917 Patent of *any filings* by the previous plaintiff or the previous defendants from this lawsuit.  For example, among other material evidence, the patentee failed to disclose the Report of Defendants' Expert

Michael I. Shamos, Ph. D, J.D. Concerning Invalidity filed on September 22, 2009. In his Report, Dr. Shamos opined that the '253 Patent was invalid in view of the prior art references presented in Defendants' First Amended Invalidity Contentions and provided a detailed explanation of both the art and the state of the art. As another example, while the applicant provided the Markman Order and Summary Judgment Order from the prior litigation, it did not cite any of the briefs or appellate materials relating thereto. Thus, the Examiner was not afforded a complete picture of the prior litigation in derogation of the applicant's duty of disclosure and candor. The filings and evidence from the prior litigation was required to be disclosed in the prosecution of the '917 Patent. MPEP § 2001.06(b)-(c).

100. Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '917 Patent not only knew of the prior litigation materials but also was aware of their materiality. For example, the patentee considered Defendants' First Amended Invalidity Contentions, the Report of Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity, the Markman Order, and the Summary Judgment Order sufficiently material to the validity of the claims of the '253 Patent to cite them during the Reexamination of the '253 Patent in an Information Disclosure Statement filed on January 10, 2010. The Examiner responsible for the Reexamination of the '253 Patent and for considering the material cited in the January 10, 2010 Information Disclosure Statement, Sam Rimell, was not the same examiner as the Examiner responsible for the examination of the '917 Patent, Michael Misiaszek. And the patentee failed to cite this material in the examination of the '917 Patent.

101. Under the broadest reasonable interpretation standard used by the PTO, the claims of the '253 Patent under reexamination when the January 10, 2010 Information Disclosure Statement was filed were not substantially different from and at most obvious variations of the

issued claims of the '917 Patent. For instance, under the broadest reasonable interpretation standard used by the PTO, issued independent claim 13 of the '917 Patent was substantively identical to claim 13 of the '253 Patent under reexamination on January 10, 2010:

| Claim 13 of the '917 Patent | Claim 13 of the '253 Patent |
|---|---|
| 13. A method of calculating a sale price in an auction <u>over a global communications network</u>, said method comprising | 1. A method of doing business <u>over a global communications network</u> comprising the steps: |
| <u>receiving data from a buyer representing participation in an intermediary activity;</u> | <u>receiving data from the buyer</u> over the global communications network, said data <u>representing the performance of the buyer during the PDA</u>; and |
| receiving data from the buyer representing <u>at least one bid for a product;</u> | [13. The method of claim 1, wherein the price is determined at least partially upon <u>participation of the buyer in an auction</u>.] |
| assigning <u>a score at least partially based on the buyer's participation in the intermediary activity;</u> | [receiving data from the buyer over the global communications network, said <u>data representing the performance of the buyer during the PDA</u>; and] |
| <u>calculating the sale price</u> using a price determining algorithm via at least one computer server, <u>wherein the sale price is at least partially dependent on the score and the at least one bid</u>. | <u>determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer</u>.<br><br>13. The method of claim 1, wherein <u>the price is determined at least partially upon participation of the buyer in an auction</u>. |

102. Documents from the prior litigation, including Defendants' First Amended Invalidity Contentions and the Report of Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity, as the patentee acknowledged these documents to be material to the validity of the claims of the '253 Patent subject to reexamination.

103.    The decision to withhold documents from the prior litigation, including Defendants' First Amended Invalidity Contentions, the prior art references listed therein (including those identified in paragraph 93), the Report of Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity, and the briefing relating to the Markman and Summary Judgment proceedings, during the prosecution of the '917 Patent, was made knowingly and with intent to deceive the PTO.  Moreover, the applicant's citation of the Markman Order and Summary Judgment Order in the '917 prosecution but not in the '982 prosecution (which overlapped in time), is indicative of an intent to deceive the PTO.  On information and belief, Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '917 Patent knowingly withheld additional material evidence of invalidity and/or unenforceability during prosecution of the '917 Patent with an intent to deceive the PTO.

104.    The pleadings from the prior litigation were not independently discovered by the Examiner of the '917 Patent, and none appear in the "References Cited" section of the '917 Patent.  On information and belief, Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '917 Patent were aware of the materiality of this evidence, yet failed to cite it during prosecution of the patent.  MPEP § 2001.06(b)-(c) (requiring disclosure of information from prior prosecution and prior litigation).

105.    But for the failure of Mr. Lin, Westerman Hattori, and others involved in the prosecution of the '917 Patent to disclose material evidence from the prior litigation, including Defendants' First Amended Invalidity Contentions, the prior art references listed therein (including those identified in paragraph 93), the Report of Defendants' Expert Michael I. Shamos, Ph. D, J.D. Concerning Invalidity, and the briefing relating to the Markman and Summary Judgment proceedings, at least claims 1-18 of the '917 Patent would not have issued.

The failure to disclose this and other material evidence germane to the prosecution of the patent caused the PTO to improperly issue the '917 Patent claims.

106.   In addition, while the applicant disclosed material relating to the reexamination of the '253 Patent during the prosecution of the '917 Patent, it made no effort to expressly apprise the PTO that the '982 Patent application was only allowed to issue because of applicant's false statements and/or withholding of material information.  Similarly, the applicant failed to disclose that it had withheld material information about the prior litigation from the '982 prosecution – even though it acknowledged that at least some of that evidence (*e.g.*, the Markman Order and Summary Judgment Order) were sufficiently material that disclosure was appropriate in the '917 prosecution.  On information and belief, the Examiner of '917 Patent, who was also responsible for allowing the '982 Patent to issue, relied on the patentability of the '982 Patent when he decided to allow the '917 Patent application.  The '917 Patent would therefore not have issued but for the applicant's inequitable conduct during the prosecution of the '982 Patent.  For example, in an Office Action issued by the Examiner on October 4, 2014, the Examiner issued only a single rejection of the pending claims of the '917 Patent application, rejecting all pending claims for obviousness-type double patenting in view of the issued claims of the '982 Patent.  The Examiner thus considered the pending claims of the '917 Patent application to not be patentably distinct from the issued claims of the '982 Patent and relied on his previous examination of the issued claims of the '982 Patent, which unbeknownst to him was tainted by the applicant's inequitable conduct.  For at least this reason, the applicant's failure to cure the inequitable conduct during the '982 Patent prosecution indelibly taints the claims of the '917 Patent.

107.     As a result of all the actions described above, all claims of the '917 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '917 and related patents.

## REQUEST FOR RELIEF

WHEREFORE, Google respectfully requests that the Court enter judgment in its favor and against Plaintiff as follows:

1.     Dismissing, with prejudice, Plaintiff's claims against Google;

2.     Denying all relief that Plaintiff seeks in its Amended Complaint;

3.     Finding this case exceptional under 35 U.S.C. § 285 and awarding Google its costs and attorneys fees; and

4.     Awarding any other relief the Court deems just and equitable.

## DEMAND FOR A JURY TRIAL

In accordance with Fed. R. Civ. P. 38, Google demands a trial by jury on all issues so triable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

David A. Perlson
Antonio R. Sistos
Michelle A. Clark
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California St., 22nd Flr.
San Francisco, CA  94111
Tel:  (415)875-6600

Robert B. Wilson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Flr.
New York, NY  10010
Tel:  (212) 849-7000

Dated:  July 29, 2014
1160794/ 41433

By:   _/s/ David E. Moore_____
        Richard L. Horwitz (#2246)
        David E. Moore (#3983)
        Bindu A. Palapura (#5370)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, DE  19801
        Tel:  (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com
        bpalapura@potteraderson.com

*Attorneys for Defendant Google Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on July 29, 2014, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on July 29, 2014, the attached document was Electronically Mailed

to the following person(s):

Richard D. Kirk
Stephen B. Brauerman
Vanessa R. Tiradentes
Sara E. Bussiere
Bayard, P.A.
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899
rkirk@bayardlaw.com
sbrauerman@bayardlaw.com
vtiradentes@bayardlaw.com
sbussiere@bayardlaw.com

Scott M. Daniels
Darrin A. Auito
Westerman Hattori Daniels & Adrian
1250 Connecticut Avenue, NW
Suite 700
Washington, D.C. 20036
sdaniels@whda.com
dauito@whda.com

By:  */s/ David E. Moore*
     Richard L. Horwitz
     David E. Moore
     Bindu A. Palapura
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, Delaware 19801
     (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com
     bpalapura@potteranderson.com

1150831/41433